

# IN THE
# TENTH COURT OF APPEALS

### No. 10-21-00147-CR

**GERARDO RODRIGUEZ,**

**Appellant**

**v.**

**THE STATE OF TEXAS,**

**Appellee**

**From the 19th District Court
McLennan County, Texas
Trial Court No. 2016-21-C1**

## MEMORANDUM OPINION ON REHEARING

We previously issued our memorandum opinion and judgment on August 31, 2022. *See, e.g., Rodriguez v. State*, No. 10-21-00147-CR, 2022 Tex. App. LEXIS 6733 (Tex. App.—Waco Aug. 31, 2022, no pet. h.) (mem. op., not designated for publication). Appellant, Gerardo Rodriguez, filed a motion for rehearing on October 17, 2022. The State has not filed a response. After review, we deny Rodriguez's motion for rehearing. However, we withdraw our memorandum opinion and judgment issued on August 31,

2022, and substitute this memorandum opinion and judgment to make non-dispositive changes.

In six issues, Rodriguez challenges his convictions for one count of injury to a child by an act and one count of injury to a child by omission. *See* TEX. PENAL CODE ANN. § 22.04(a). We affirm.

## Background

Rodriguez was initially charged by indictment with one count of injury to a child, L.R., by omission for failure to seek proper medical care causing serious bodily injury. *See id.* § 22.04(a)(1). He was later reindicted with one count of injury to L.R. by omission for failure to seek proper medical care causing serious bodily injury ("Count 1") and one count of injury to L.R. by act causing serious bodily injury and/or serious mental deficiency, impairment, or injury ("Count 2").[1] *See id.* § 22.04(a)(1)-(2).

_____

[1] Specifically, the two-count indictment provided the following:

[O]n or about the 3rd day of April, 2015, in said county and state did then and there intentionally and knowingly, by omission, cause serious bodily injury to [L.R.], a child 14 years of age or younger, by failing to seek proper medical care, and the Defendant had a legal duty to act, namely, as the infant's parent after the infant sustained skull fractures, retinal hemorrhages and bruises to his face, anus and leg.

**COUNT II**

And it is further presented in and to said Court that the said **GERARDO RODRIGUEZ**, in the County of McLennan and State aforesaid on or about the 3rd day of April, 2015, did then and there intentionally and knowingly cause serious bodily injury and/or serious mental deficiency, impairment or injury to [L.R.], a child 14 years of age or younger, by striking and/or hitting and/or slamming and/or shaking [L.R.] causing skull fractures and/or retinal hemorrhages and/or bruising to his face, leg and anus.

(Emphasis in original).

Both counts were submitted to the jury using language mirroring that which was contained in the two-count re-indictment. The jury found Rodriguez guilty in both counts and assessed punishment for each count at life imprisonment with a $10,000 fine. Rodriguez appeals both convictions.

## Venire Member's Improper Remarks

In his fifth issue, Rodriguez contends that the trial court erred by denying his request for a mistrial during voir dire based on improper remarks made by a potential juror that spoiled the remaining panel.

APPLICABLE LAW

We review the denial of a motion for mistrial under an abuse-of-discretion standard. *Archie v. State*, 221 S.W.3d 695, 699-700 (Tex. Crim. App. 2007). Under this standard, we uphold the trial court's ruling as long as the ruling is within the zone of reasonable disagreement. *Id.* "'A mistrial is a device used to halt trial proceedings when error is so prejudicial that expenditure of further time and expense would be wasteful and futile.'" *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000) (quoting *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999)). It is appropriate only for "a narrow class of highly prejudicial and incurable errors." *Id.*; *see Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). Therefore, a trial court properly exercises its discretion to declare a mistrial when, due to the error, "an impartial verdict cannot be reached" or a conviction

would have to be reversed on appeal due to "an obvious procedural error." *Wood*, 18 S.W.3d at 648; *see Ladd*, 3 S.W.3d at 567.

DISCUSSION

When the trial court asked the venire panel if anyone had ever served on a criminal jury, Venireperson 65 offered the following response in the presence of the entire venire panel:

| | |
|---|---|
| VENIREPERSON 65: | Yes, sir. I'm [P.M.]. I'm pretty sure this Defendant has been locked up since 2015. I'm pretty sure I processed him in quite a few times in the McLennan County jail, Jack Harwell Detention Center. |
| THE COURT: | In [sic] that where you work, sir? |
| VENIREPERSON 65: | That's where I'd been working, sir. |
| THE COURT: | Is there anything about that interaction that would prevent you from being fair and impartial and listening only to the evidence in the case? |
| VENIREPERSON 65: | Just from a part of his demeanor—his demeanor and attitude towards whenever we processed him in, it would. |
| THE COURT: | So you couldn't be fair in this particular case? |
| VENIREPERSON 65: | No, sir. |

The trial court and the parties then continued to ask questions of other members of the venire panel. Defense counsel did not object at the time when Venireperson 65 offered his remarks.

Rodriguez v. State                                                                                                           Page 4

Later, at the break for lunch and outside the presence of the venire panel, defense counsel complained about Venireperson 65:

[Defense counsel]:   Yes, Your Honor.  Juror 65 earlier made comments to the jury—

THE COURT:   Right.

[Defense counsel]:   —that included him saying that multiple times he had contact with him as an employee of the McLennan County jail.  I would make a motion to strike that juror first.

[The State]:   And the State's not opposed to that.

[Defense counsel]:   Additionally, I would ask that there be an instruction, if any—if they—if a panel is sat today as to disregarding his comments.

[The State}:   And State has no objection to that.

When asked about the timing of the instruction, defense counsel indicated that he wanted the trial court to wait until a jury was impaneled to provide an instruction that "anything said by a venire panel member during voir dire is not evidence."  Defense counsel then moved for a mistrial based on "spoliation of this panel."  The trial court denied defense counsel's motion for mistrial.  Further, when asked two days later, on the day of trial, if he still wanted an instruction regarding Venireperson 65, defense counsel stated:  "I do not.  I do not, Judge.  I thought about it.  I thought about it a lot.  And it's over."

When a party requesting a mistrial does not first seek a lesser remedy—usually a judge's instruction to the jury to disregard what they heard—reversal is inappropriate if

any prejudice could have been cured by a less drastic alternative. *See Young v. State*, 137 S.W.3d 65, 69-70 (Tex. Crim. App. 2004). An instruction to disregard usually cures any prejudice. *Gonzalez v. State*, 455 S.W.3d 198, 206 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). There is an appellate presumption that an instruction to disregard will be obeyed. *See Gardner v. State*, 730 S.W.2d 675, 696 (Tex. Crim. App. 1987). An instruction fails to cure prejudice when the instruction fails to "leave the jury in an acceptable state to continue the trial." *Young*, 137 S.W.3d at 69.

Although defense counsel requested an instruction to disregard, he requested that the trial court delay instructing the jury until the jury was impaneled. Without the benefit of a curative instruction, defense counsel moved for a mistrial and later rescinded his request for an instruction to disregard. Defense counsel's actions are the functional equivalent of requesting a mistrial first without seeking a lesser remedy. Accordingly, we must determine whether an instruction to disregard would have sufficed. *See Archie*, 221 S.W.3d at 699; *see also Young*, 137 S.W.3d at 69-70.

We find nothing in this record demonstrating that an instruction to disregard would not have cured any prejudice. Venireperson 65's bias had nothing to do with mistreating children, which was the basis of this case. Furthermore, it is particularly telling that defense counsel ultimately decided to rescind his request for an instruction, believing that any jury bias stemming from Venireperson 65's remarks had dissipated over time. Based on our review of the record, we conclude that the trial court did not

abuse its discretion by denying Rodriguez's motion for mistrial. We overrule Rodriguez's fifth issue.

## Exclusion of Evidence

In his fourth issue, Rodriguez asserts that the trial court abused its discretion by excluding Rios's purported admission to spiritualist Obdulia Figueroa that she had hit L.R. at an unspecified time. Rodriguez argues that the exclusion of this statement deprived him of his right to present a complete defense. We hold that Rodriguez failed to preserve this complaint.

To preserve a complaint for appellate review, the record must show that the appellant presented the complaint to the trial court "with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX. R. APP. P. 33.1(a)(1)(A). The point of error on appeal must comport with the objection made at trial. *Thomas v. State*, 723 S.W.2d 696, 700 (Tex. Crim. App. 1986) (en banc). Rodriguez does not direct us to, nor have we found, a place in the record where he brought this complaint based upon a constitutional violation to the attention of the trial court and obtained an adverse ruling.

Appellant's constitutional right to a meaningful opportunity to present a complete defense stems from the Due Process Clause of the Fourteenth Amendment and the Compulsory Process and Confrontation Clauses of the Sixth Amendment and is a right subject to procedural default. *Anderson v. State*, 301 S.W.3d 276, 280 (Tex. Crim. App.

2009); *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995) (holding that appellant failed to preserve his claim that he was denied the right to present a defense and the right to due process and due course of law because he did not make that objection at trial). Because Rodriguez did not object to the exclusion of Figueroa's testimony based on the deprivation of his right to present a complete defense, Rodriguez failed to preserve this issue for appellate review. We overrule Rodriguez's fourth issue.

## Sufficiency of the Evidence

In his first issue, Rodriguez contends that the evidence is insufficient to support his conviction in Count 1 for injury to a child by omission because he did not know L.R. was injured. In his second issue, Rodriguez challenges the sufficiency of the evidence supporting his conviction in Count 2 for injury to a child by an act.

STANDARD OF REVIEW

The Court of Criminal Appeals has expressed our standard of review of a sufficiency issue as follows:

> When addressing a challenge to the sufficiency of the evidence, we consider whether, after viewing all of the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017). This standard requires the appellate court to defer "to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319, 99 S. Ct. 2781. We may not re-weigh the evidence or substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). The court conducting a sufficiency review must not engage in a

"divide and conquer" strategy but must consider the cumulative force of all the evidence. *Villa*, 514 S.W.3d at 232. Although juries may not speculate about the meaning of facts or evidence, juries are permitted to draw any reasonable inferences from the facts so long as each inference is supported by the evidence presented at trial. *Cary v. State*, 507 S.W.3d 750, 757 (Tex. Crim. App. 2016) (citing *Jackson*, 443 U.S. at 319, 99 S. Ct. 2781); *see also Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). We presume that the factfinder resolved any conflicting inferences from the evidence in favor of the verdict, and we defer to that resolution. *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012). This is because the jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13.

We measure whether the evidence presented at trial was sufficient to support a conviction by comparing it to "the elements of the offense as defined by the hypothetically correct jury charge for the case." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge is one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*; *see also Daugherty v. State*, 387 S.W.3d 654, 665 (Tex. Crim. App. 2013). The "law as authorized by the indictment" includes the statutory elements of the offense and those elements as modified by the indictment. *Daugherty*, 387 S.W.3d at 665.

*Zuniga v. State*, 551 S.W.3d 729, 732-33 (Tex. Crim. App. 2018).

FACTS

On April 3, 2015, Rodriguez cared for eight-week-old L.R. while the child's biological mother, Candace Rios, was working a shift at McDonald's. Rios stated that Rodriguez had intended to drop L.R. off at her grandparents' house, but no one was

home.  When she left for work, there was no one else at the house, except for Rodriguez and L.R.

Derek Thiele, formerly a sergeant with the Waco Police Department, confirmed that Rios's timecard showed that her shift began at 6:46 a.m. and ended at 3:39 p.m. on the day in question.  Thiele testified that he learned from Rios's manager, Joe Summers, that throughout her shift, Rios ran "back and forth from the register area to the restroom, coming back and forth crying, emotionally upset several times throughout her shift to the point where she left."  Summers told Thiele that Rios appeared upset about phone conversations that she had with someone who was later identified as Rodriguez.

After completing her shift at McDonald's, Rios returned home and assumed caring for L.R.  Rodriguez informed Rios that L.R. had thrown up; Rodriguez had given L.R. a bath; and Rodriguez had changed L.R.'s diaper.  Shortly after Rios arrived at home, Rodriguez left.  Rios was at the house with L.R. for about an hour and a half.  At this time, Rios tried to take a nap, but L.R. was crying, fussy, and refused to drink his formula.  Rios took L.R. to her grandparents' house.

When Rios arrived at her grandparents' house, her uncle, her siblings, her mother, and her grandfather were present.  Rios's sister, Marcela Garcia, recalled that L.R. was "fussy, crying . . . .  It looked like something was wrong with him . . . ."  Rios's mother approached L.R. and noticed that he was running a fever.  Rios, her mother, and her uncle

took L.R. to Providence Hospital in Waco, Texas, because it was too late to "get to the clinic at that time." Rodriguez arrived at the hospital later.

Dr. Daniel Elwell, an emergency-room doctor who previously worked at Providence Hospital, examined L.R. Dr. Elwell recalled that Rodriguez had stated that L.R. had been "crying nonstop," vomited, and had not eaten since vomiting. L.R. presented with a fever and a concerning pulse rate of 184. During the physical examination of L.R., Dr. Elwell discovered that L.R. had a small hematoma on his head, a palpable skull fracture, and other bruises. L.R. appeared listless to Dr. Elwell, and Dr. Elwell ultimately concluded that, without medical intervention, L.R.'s condition would have rapidly declined and L.R. may not have survived. Rios and Rodriguez, who were both present at the hospital, were told of L.R.'s condition. Rodriguez was "just standing there, as if it was not a surprise," and Rios started crying and was "visibly upset." Because his condition was worsening, L.R. was transported by helicopter to McLane Children's Hospital in Temple, Texas, and was immediately intubated and placed on a ventilator.

Paula Wilson, a nurse at McLane Children's Hospital, recounted that L.R.'s chief complaints were "left parietal skull fracture, acute subdural hematoma, chronic subdural hematoma, temporal fracture." Nurse Wilson also observed numerous other bruises on L.R. She spoke with Rodriguez about what happened that day and recalled Rodriguez noting the following:

> I stayed home. I gave him a bottle. He slept. I gave him a bottle, he slept. He threw up. I bathed him. I left for the grandma's with the baby, but nobody was home. Then I gave him a bottle again. The baby threw up, so I have [sic] him a bath. I put him in the crib. I left him in the crib when his mother got home. I went to a friend's body shop. The baby was home with his mother. The mother said they were going to the hospital because the baby was having [a] fever.

Rodriguez denied noticing anything wrong with L.R. However, Nurse Wilson said it was noteworthy that eight-week-old L.R. threw up twice because "it could be an indicator if the baby was sick, if they're not tolerating their feeding."

Dr. Erica Ward, medical director of the child protection team at McLane Children's Hospital, testified that a CT scan of L.R.'s head revealed that L.R. had a skull fracture that was pulling apart because of "[u]nderlying pressure around the brain swelling." Indeed, L.R. had two skull fractures. Dr. Ward also observed that L.R. had bruising around the anus and on the right side of the forehead. According to Dr. Ward, this bruising is "very, very uncommon to see . . . on a child this age. And a bruise in any location on a child this age is very concerning."

Dr. Eric Stern, a pediatric emergency medicine doctor that previously worked at McLane Children's Hospital and treated L.R. on the evening in question, commented that "any traumatic brain injury can increase your chance for seizures. This child had significant traumatic brain injury. And so the concern would be that any further seizure activity would increase the risk of, you know, secondary or further damages to the brain." Dr. Stern also opined that a brain scan of L.R. showed bleeding on the brain. Doctors

were unable to precisely date the bleeding. Dr. Stern emphasized that with the injuries L.R. sustained, "it was critical that the patient receive care as soon as possible. Not just in terms of living or dying. But also in terms of the ultimate long-term neurologic injury that the child would have." Dr. Stern further noted that "this patient obviously was at risk for a very—for a very significant long-term disability from the injuries received."

On cross-examination, Dr. Stern viewed a video that Rodriguez had sent to relatives while caring for L.R. that day, and Dr. Stern noted that the video showed L.R. was lethargic and that "this baby was obviously having significant posturing motor activity, shaking. So they were having significant stimulation. But their eyes were closed. There was some purposeful movement in the middle of the video and some noises. But it's strange that the baby was not more awake during that." Dr. Stern also stated, "based on the appearance in the video, I think that is obviously that to me that the child had sustained—sustained a significant medical problem, in this case a traumatic brain injury that was causing super abnormal behavior in the video." Both Dr. Stern and Dr. Ward testified that it would have been apparent to any adult around the child that something was wrong, and that medical attention was needed.

Dr. Ryan Laschober, a family medicine physician, testified that he examined L.R. on April 2, 2015, for spitting up. Dr. Laschober's documentation reflected "a normal follow-up for spitting up." Dr. Laschober did not notate any bruising on L.R. at the time of the examination.

COUNT 1 OF THE INDICTMENT

In Count 1, Rodriguez was charged with injury to a child by omission by intentionally or knowingly causing serious bodily injury to L.R. A person commits the offense of injury to a child if he "intentionally, knowingly, or recklessly with criminal negligence by act or intentionally, knowingly, or recklessly by omission, causes to a child . . . serious bodily injury." TEX. PENAL CODE ANN. § 22.04(a)(1); *Jefferson v. State*, 189 S.W.3d 305, 312 (Tex. Crim. App. 2006). Under section 22.04(e), causing bodily injury by an omission, i.e., a failure to act, is a first-degree felony when the actor "intentionally or knowingly" failed to act. TEX. PENAL CODE ANN. § 22.04(e). "Serious bodily injury" is defined as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(46); *see also id.* § 1.07(8) (defining bodily injury as "physical pain, illness, or any impairment of physical condition").

A parent has a statutory duty to care for, control, protect, and provide food and medical care for a child. TEX. FAM. CODE ANN. § 151.001(a)(2)-(3) (providing that "[a] parent of a child has [enumerated] rights and duties," including "the duty of care, control, protection, and reasonable discipline of the child" and "the duty to support the child, including providing the child with clothing, food, shelter, medical and dental care, and education"); *see* TEX. PENAL CODE ANN. § 22.04(d) ("For purposes of an omission that causes a condition described by Subsection (a)(1), (2), or (3), the actor has assumed care,

custody, or control if the actor has by act, words, or course of conduct acted so as to cause a reasonable person to conclude that the actor has accepted responsibility for protection, food, shelter, or medical care for a child . . . .").

A person acts intentionally with respect to the result of his conduct when it is his conscious objective or desire to cause the result. TEX. PENAL CODE ANN. § 6.03(a). A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably likely to cause the result. *Id.* § 6.03(b). Injury to a child is a result-oriented offense requiring a mental state that relates not to the specific conduct but to the result of that conduct. *See Stuhler v. State*, 218 S.W.3d 706, 718 (Tex. Crim. App. 2007). The evidence is sufficient to support a conviction for injury to a child by omission if the State proves either that a defendant intended to cause the injury through his omission or that he was aware that his omission was reasonably certain to cause the injury. *Proo v. State*, 587 S.W.3d 789, 809-10 (Tex. App.—San Antonio 2019, pet. ref'd). In other words, knowingly causing the child's injury requires evidence that the defendant was aware with reasonable certainty that the result of serious bodily injury or death would have been prevented had the defendant performed the act that was omitted. *Payton v. State*, 106 S.W.3d 326, 329 (Tex. App.—Fort Worth 2003, pet. ref'd). Mental state is rarely proved through direct evidence and almost always depends on circumstantial evidence. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). Intent may be inferred from any facts which tend to prove their existence, including the acts, words, and conduct of the

accused, as well as the method of committing the crime and the nature of the wounds inflicted on the complainant. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); *see also Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995).

Under the hypothetically correct jury charge for the offense alleged in Count 1, the State was required to prove that Rodriguez, while having a statutory duty to act on L.R.'s behalf, intentionally or knowingly by omission caused L.R. serious bodily injury by failing to seek proper medical care. *See* TEX. PENAL CODE ANN. § 22.04(a)(1).

As noted above, the evidence showed that, while in Rodriguez's care, L.R. vomited twice, cried non-stop, and had not eaten. Nurse Wilson opined that the vomiting was an indicator that L.R. might have been sick and in need of medical attention. The medical testimony also established that L.R. had palpable skull fractures and multiple bruises on his body that were not present on April 2, 2015, when Dr. Laschober examined L.R. With respect to L.R.'s injuries to his skull, Dr. Stern testified that it was critical for L.R. to receive medical care as soon as possible, not only in terms of living or dying, but also to mitigate long-term neurologic injury. Dr. Stern further testified that a video taken of L.R. by Rodriguez while L.R. was in Rodriguez's care on the day in question revealed that L.R. had sustained a traumatic brain injury that caused "super abnormal behavior" that would have been apparent to an adult that medical attention was needed. Further, the jury could have reasonably inferred that the skull fractures and bruises would have been visible to Rodriguez when he bathed L.R. Observation of bruising on L.R. is of

importance because Dr. Ward noted that any bruising on a child of this age would be "very concerning." Moreover, the evidence established that even though L.R.'s condition worsened throughout the day, Rodriguez did not seek medical care for L.R.; rather, he returned L.R. to Rios. *See Proo*, 587 S.W.3d at 810 (noting that the causal link between the defendant's failure to act and the serious bodily injury may be proven through reasonable inference based on the evidence); *see also Baldwin v. State*, 264 S.W.3d 237, 242 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd) ("A jury may reasonably infer that the defendant intentionally, not accidentally, inflicted the injury when the defendant fails to render aid known to be needed.").

Based on the foregoing, we conclude that there was sufficient evidence for the jury to conclude that Rodriguez intentionally or knowingly failed to seek medical care for L.R.'s injuries and that his failure to do so caused L.R. serious bodily injury. *See Desormeauux v. State*, 362 S.W.3d 233, 241 (Tex. App.—Beaumont, no pet.) (holding that the jury could reasonably conclude that the failure to seek medical treatment caused incrementally greater injury increasing the risk of death where the child was in obvious physical distress and having difficulty breathing, but rather than seek medical treatment, the defendant shook the child repeatedly to wake him up); *Johnston v. State*, 150 S.W.3d 630, 637 (Tex. App.—Austin 2004, no pet.) (holding that there was legally sufficient evidence that the defendant's omission caused serious bodily injury where the defendant delayed the child's medical treatment for several days while the child's health visibly

deteriorated and the child's condition was critical when he was examined at the hospital due to dehydration and buildup of stomach secretions); *see also Wright v. State*, 494 S.W.3d 352, 361 (Tex. App.—Eastland 2015, pet. ref'd) (noting that the existence or nonexistence of a causal connection, in an injury-to-a-child-by-omission case, is a question for the jury's determination) (citations omitted). We overrule Rodriguez's first issue.

COUNT 2 OF THE INDICTMENT

In Count 2, Rodriguez was charged with injury to a child by an act causing serious bodily injury and/or serious mental deficiency, impairment, or injury. Before addressing the sufficiency of the evidence to support Count 2, we must address a problem with the indictment that flowed to the jury charge in this case. Although not raised specifically in the trial court or on appeal, this problem affects the analysis of the sufficiency of the evidence supporting Count 2.

As mentioned earlier, the Court of Criminal Appeals has observed that section 22.04 of the Texas Penal Code is a result-of-conduct type of offense. *See Stuhler*, 218 S.W.3d at 718 (noting that prior cases have "regarded the gravamen of the offense of injury to a child to be, not the particular conduct that caused the injury, but the resulting injury that the conduct caused"). Section 22.04(a) prescribes three results of conduct injuring a child: (1) serious bodily injury; (2) serious mental deficiency, impairment, or injury, or (3) bodily injury. *See* TEX. PENAL CODE ANN. § 22.04(a). For purposes of deciding whether a jury had to be unanimous with respect to a verdict under any one

subsection, the *Stuhler* Court concluded that each subsection constituted a distinct offense.[2] *Stuhler*, 218 S.W.3d at 718-19.

Recently, in *Nawaz v. State*, the Court of Criminal Appeals extended the *Stuhler* analysis involving jury unanimity for the subsections set out in section 22.04(a) to double jeopardy. 2022 Tex. Crim. App. LEXIS 418, at **12-13 (Tex. Crim. App. June 22, 2022) ("Having found the various theories of criminal liability set out in the subsections of Section 22.04(a) to constitute different offenses for jury unanimity purposes in *Stuhler*, we perceive no basis to construe the statute any differently for purposes of double jeopardy." (internal citations & quotations omitted)).

As it relates to the sufficiency analysis of Count 2, what is clear from *Stuhler* and *Nawaz* is that the Court of Criminal Appeals treats each subsection of section 22.04(a) as separate and distinct offenses. *Stuhler* and *Nawaz* impact our analysis of Count 2 in this case because the State alleged two separate and distinct offenses—that Rodriguez caused serious bodily injury to L.R. under section 22.04(a)(1) and/or serious mental deficiency, impairment, or injury under section 22.04(a)(2). Or, in other words, the State alleged two different offenses within the same count—Count 2. When this happens, the indictment is said to be duplicitous. *See Brock v. State*, 495 S.W.3d 1, 6 (Tex. App.—Waco 2016, pet. ref'd) ("'Duplicity' is the technical fault of uniting two or more distinct and separate

---

[2] Rodriguez does not raise a jury-unanimity complaint on appeal, nor does he complain about the indictment or the jury charge in this case.

offenses in the same count of an indictment. The rule against duplicitous indictments is based on the proposition that a defendant must receive fair notice of the charge against which he must defend." (internal citations omitted)); *see also* TEX. CODE CRIM. PROC. ANN. art. 21.24(a) ("Two or more offenses may be joined in a single indictment, information, or complaint, with each offense stated in a separate count, if the offenses arise out of the same criminal episode . . . .").

However, despite what appears to be a duplicitous indictment as to Count 2, the record does not reflect that defense counsel objected or moved to quash the indictment. *See* TEX. CODE CRIM. PROC. ANN. art. 1.14(b) (providing that if a defendant does not object to a defect, error, or irregularity of form or substances in an indictment before the date on which trial on the merits begins, he waives the right to object and may not raise the objection on appeal or in any post-conviction proceeding); *see also Faulks v. State*, 528 S.W.2d 607, 608-09 (Tex. Crim. App. 1975) (concluding that appellant failed to preserve his complaint that the indictment was duplicitous by failing to file a written motion to quash, even though an oral motion to quash was made immediately prior to trial); *see also Sanchez v. State*, 928 S.W.2d 255, 257 (Tex. App.—Houston [14th Dist.] 1996, no pet.) (stating that an objection is required to preserve a misjoinder error in the indictment); *Skillern v. State*, 890 S.W.2d 849, 872 (Tex. App.—Austin 1994, pet ref'd) (holding that duplicity in the indictment may not be raised on appeal without timely objection prior to trial).

Although the State's section 22.04(a)(1) and (a)(2) allegations should have been indicted as separate counts under *Stuhler* and *Nawaz*, because defense counsel did not object to the indictment, we will consider the sufficiency of the evidence supporting the section 22.04(a)(1) and (a)(2) allegations in Count 2 of the indictment.

**The State's Section 22.04(a)(2) Allegation**

Under a hypothetically correct jury charge corresponding to the State's section 22.04(a)(2) allegation in Count 2, the State was required to prove beyond a reasonable doubt that Rodriguez, by an act, caused serious mental deficiency, impairment, or injury to L.R., a child. *See* TEX. PENAL CODE ANN. § 22.04(a)(2). As recounted above, Dr. Laschober examined L.R. on April 2, 2015, for spitting up. At that time, neither Dr. Laschober nor his nurses observed L.R. with any significant injuries. Furthermore, Rodriguez's friend, Abraham Lizama, testified that he saw Rodriguez with L.R. from about 10:00 a.m. to 11:00 a.m. on April 3, 2015, when Rodriguez arrived at Ivan Lizama's mechanic shop to help. Abraham recalled that L.R. "seemed fine."

Rodriguez testified that he put L.R. down for a nap around 1:00 p.m. on April 3, 2015, and that L.R. began to wake up around 2:30 or 2:45 p.m. on the same day. By the time L.R. had begun to wake up, Rodriguez recalled that he was taking pictures and a video of L.R. for relatives. The video taken by Rodriguez was admitted into evidence. Dr. Stern reviewed the video and noted that the video showed that L.R. had sustained a traumatic brain injury that caused "super abnormal behavior" that would have been

apparent to an adult. Thus, the jury could have reasonably inferred that L.R. sustained serious bodily injuries sometime between 11:00 a.m. and when the video was taken at around 2:30 p.m. The jury could have also reasonably inferred that Rodriguez caused L.R.'s serious mental deficiency, impairment, or injury because it is undisputed that L.R. was in Rodriguez's sole care during this time period.[3] *See Bearnth v. State*, 361 S.W.3d 135, 140 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) ("Texas case law is replete with holdings that when an adult defendant has had sole access to a child at the time [the child's] injuries are sustained, the evidence is sufficient to support a conviction for injury to a child, or murder if the child dies." (quoting *Garcia v. State*, 16 S.W.3d 401, 405 (Tex. App.—El Paso 2000, pet. ref'd))); *see also Byrd v. State*, No. 09-12-00234-CR, 2013 Tex. App. LEXIS 5967, at **11-12 (Tex. App.—Beaumont May 15, 2013, no pet.) (mem. op., not designated for publication) (concluding that the evidence was sufficient to support a conviction for injury to a child where the child's mother left the child in the defendant's care in a healthy, normal condition and the defendant was the only adult with the child from the time the mother left that morning until she returned in the afternoon to find the child severely injured).

---

[3] Additional indicia of guilt that the jury could have reasonably considered were Rodriguez's lack of reaction at the hospital when told about L.R.'s injuries, as well as testimony from Derek Thiele, formerly a sergeant with the Waco Police Department, who learned during the investigation that Rios had told her friend that "she would take the blame so Gerardo wouldn't get sent back," and testimony that Rios was pressured by Rodriguez's family to take the blame so Rodriguez would not "lose his papers."

Moreover, Dr. Stern emphasized that the bleeding on L.R.'s brain could cause long-term neurological problems. Indeed, L.R.'s adoptive mother noted that L.R. has had multiple surgeries to drain excess fluids from his skull and to remedy seizures and that L.R.'s brain injuries required a VP shunt[4] to drain excess fluid. L.R.'s adoptive mother also testified that L.R. is in special classes, has ADHD and OCD making it hard for him to focus, and that he is developmentally delayed because of the injuries he sustained. We therefore conclude that there was sufficient evidence to conclude that Rodriguez intentionally or knowingly caused serious mental deficiency, impairment, or injury to L.R. *See* TEX. PENAL CODE ANN. § 22.04(a)(2); *see also Nawaz*, 2022 Tex. Crim. App. LEXIS 418, at *17 (concluding that there was sufficient evidence to support injury to a child by causing serious mental deficiency where the evidence showed diffuse brain bleeding that caused the child's developmental delays); *Franco v. State*, No. 13-14-00108-CR, 2016 Tex. App. LEXIS 6340, at **18-21 (Tex. App.—Corpus Christi June 16, 2016, no pet.) (concluding that there was sufficient evidence to establish serious mental injury where

---

[4] In her testimony, L.R.'s adoptive mother described the VP shunt as follows:

So what it is, it's a—it's an object that he has right here on the right side of his skull. And then he has a line that goes all of the way from the back of his skull and then it goes all of the way down to his—where his bladder is. Our brain, or I guess our skull—our brain is— drains our excess liquid normally. But because of the injury that he sustained, that VP shunt is what helps him drain the excess liquid from—from his—from his skull. Because it is stops malfunction—if it malfunctions, it stops working, his head will—it'll start filling up and then it's not draining anywhere. And so he'll start having a headache. And just— it'll get worse from there if I don't seek medical attention for him. So it's basically keeping him alive.

the child was diagnosed with post-traumatic stress disorder and attention deficit disorder as a result of the conduct of the defendant).

**The State's Section 22.04(a)(1) Allegation**

Because at least one allegation under section 22.04 contained in Count 2 is supported by sufficient evidence, and because the indictment and charge used the conjunctive and disjunctive "and/or" when referencing the two allegations, we need not address the sufficiency of the evidence supporting the State's section 22.04(a)(1) allegation that Rodriguez intentionally and knowingly injured L.R. by an act causing serious bodily injury. *See* TEX. R. APP. P. 47.1, 47.4; *Stuhler*, 218 S.W.3d at 718-19; *see also Nawaz*, 2022 Tex. Crim. App. LEXIS 418, at **14-15 ("The allowable units of prosecution in this case are determined by how many separate and discrete statutorily defined types of injurious results Appellant's act or conduct caused. It does not matter how many acts or incidents of abuse it may have taken him to inflict those distinct statutorily defined injuries."). Accordingly, we overrule Rodriguez's second issue.

## Double Jeopardy

In his third issue, Rodriguez asserts that his convictions for injury to a child by an act and injury to a child by omission violate the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution. *See* U.S. CONST. amend. V.

"The Double Jeopardy Clause of the Fifth Amendment . . . protects an accused against . . . multiple punishments for the same offense." *Evans v. State*, 299 S.W.3d 138,

140-41 (Tex. Crim. App. 2009). A double-jeopardy claim must generally be raised in the trial court to preserve error for appellate review. *Gonzalez v. State*, 8 S.W.3d 640, 643- 46 (Tex. Crim. App. 2000); *Rangel v. State*, 179 S.W.3d 64, 70 (Tex. App.—San Antonio 2005, pet. ref'd). However, a double-jeopardy claim may be raised for the first time on appeal when (1) the undisputed facts show the double-jeopardy claim violation is clearly apparent from the face of the record, and (2) enforcement of the usual rules of procedural default serves no legitimate State purpose. *See Gonzalez*, 8 S.W.3d at 643; *see also Rangel*, 179 S.W.3d at 70.

> [W]hen separate theories for an offense are issued to the jury disjunctively, a double jeopardy violation is not clearly apparent on the face of the record if one of the theories charged would not constitute a double jeopardy violation and there is sufficient evidence to support that valid theory. The fact that the jury's verdict *could* have relied on a theory that would violate the Double Jeopardy Clause is not sufficient to show a constitutional violation "clearly apparent on the face of the record."

*Langs v. State*, 183 S.W.3d 680, 687 (Tex. Crim. App. 2006) (citing *Gonzalez*, 8 S.W.3d at 641-43) (emphasis in original).

"When separate and distinct offenses occur in the same transaction, the protection against double jeopardy does not apply. *Urtado v. State*, 333 S.W.3d 418, 424 (Tex. App.—Austin 2011, pet. ref'd) (citing *Spradling v. State*, 773 S.W.2d 553, 556 (Tex. Crim. App. 1989)). "Thus, if two different attacks occur, even if close in time, a defendant may be charged with separate assaults." *Id.* (citing *Teeter v. State*, No. PD-1169-09, 2010 Tex. Crim. App. LEXIS 1206, at *24 (Tex. Crim. App. Sept. 22, 2010) (holding that a double-jeopardy

violation occurred where charges of assault by threat and attempted capital murder were both based on a single act of pointing a gun at the victim); *Sanchez v. State*, 269 S.W.3d 169, 171 (Tex. App.—Amarillo 2008, pet. ref'd) (holding no double-jeopardy violation occurred where the defendant was charged with both assault by causing bodily injury and assault by threat against the same victim because, "[t]hough rather close in time, the latter arose after a break from the former.")).

Here, Rodriguez did not object in the trial court on double-jeopardy grounds. Further, because the evidence supported at least two separate and distinct offenses (injury to a child by omission causing serious bodily injury and injury to a child by act causing serious mental deficiency, impairment, or injury), we cannot say that Rodriguez's double-jeopardy claim is apparent from the face of the record. *See Stuhler*, 218 S.W.3d at 718-19; *Gonzalez*, 8 S.W.3d at 643; *Rangel*, 179 S.W.3d at 70; *see also Nawaz*, 2022 Tex. Crim. App. LEXIS 418, at **12-13. As such, Rodriguez has not properly preserved his double-jeopardy claim. *See Langs*, 183 S.W.3d at 687; *Gonzalez*, 8 S.W.3d at 641-43; *see also Spradling*, 773 S.W.2d at 556; *Urtado*, 333 S.W.3d at 424; *Sanchez*, 269 S.W.3d at 171. We overrule Rodriguez's third issue.

**Rodriguez's Motion for New Trial**

In his sixth issue, Rodriguez argues that the trial court erred by not granting him a hearing on his motion for new trial, where reasonable grounds existed that potentially entitled him to relief. We disagree.

We review the trial court's denial of a hearing on a motion for new trial for an abuse of discretion, and we reverse only if the decision was so clearly wrong as to lie outside the zone within which reasonable persons might disagree. *Smith v. State*, 286 S.W.3d 333, 339 (Tex. Crim. App. 2009). The purposes of a hearing on a motion for new trial are to: (1) determine whether the case should be retried; and (2) prepare a record for presenting issues on appeal if the motion is denied. *Id.* at 338. A hearing on a motion for new trial court is not an absolute right. *Id.* A hearing is not required when matters raised in the motion for new trial are subject to being determined from the record. *Id.* But a trial judge abuses his discretion in failing to hold a hearing on a motion for new trial when the motion and accompanying affidavits (1) raise matters that are not determinable from the record, and (2) establish reasonable grounds showing that the defendant could potentially be entitled to relief. *Hobbs v. State*, 298 S.W.3d 193, 199 (Tex. Crim. App. 2009).

To establish the existence of reasonable grounds showing he could be entitled to relief, the defendant is required to support his motion for new trial with an affidavit, either of the defendant or someone else, specifically setting out the factual basis for the claim. *Smith*, 286 S.W.3d at 339. The affidavit need not establish a prima facie case, or even reflect every component legally required to establish relief. *Id.* It is sufficient if a fair reading of it gives rise to reasonable grounds in support of the claim. *Id.* But affidavits that are conclusory in nature and unsupported by facts do not provide the requisite notice of the basis for the relief claimed; thus, no hearing is required. *Id.*

In his motion for new trial, Rodriguez asserted four grounds: (1) that he was deprived of critical testimony from a material witness, Figueroa; (2) the trial court deprived him of his Sixth Amendment right to present a defense by excluding and redacting text messages purportedly proving his innocence; (3) statements made by Venireperson 65 deprived him of the right to a fair and impartial jury; and (4) the jury's verdict is contrary to the law and evidence. In support of his motion for new trial, Rodriguez included declarations from trial counsel and the adopted mother of L.R.

The issues of Figueroa's testimony and the commentary provided by Venireperson 65 were both argued extensively at trial and were ruled on during trial. Furthermore, we have rejected both arguments earlier in this opinion. The record also shows that the State objected to admitting any text messages that had not been translated into English. Defense counsel responded, "I can agree with that. And I'll read only the English texts. I'm gonna focus on the timeline. But for now, I ask that D1 be admitted." The trial court admitted the text messages "without referring to the ones that are in Spanish." Defense counsel never sought to translate or admit any of the Spanish language messages. And finally, the trial court, having presided over the trial, was able to determine whether a hearing was necessary to address Rodriguez's claim that the jury's verdict was contrary to the law and evidence. *See Waller v. State*, 931 S.W.2d 640, 644 (Tex. App.—Dallas 1996, no pet.) ("A 'verdict' that is contrary to 'the law and the evidence' raises issues that the

trial court can determine from the record.  The trial court did not abuse its discretion by overruling appellant's motion for new trial without first conducting a hearing.").

Based on the foregoing, we cannot say that the trial court abused its discretion by denying Rodriguez's request for a hearing on his motion for new trial.  *See Smith*, 286 S.W.3d at 339.  This is because all the complaints raised in Rodriguez's motion for new trial are subject to being determined from the record.  *See id.*  As such, we overrule Rodriguez's sixth issue.

## Conclusion

Having overruled all of Rodriguez's issues, we affirm the judgments of the trial court.

STEVE SMITH
Justice

Before Chief Justice Gray,
      Justice Johnson, and
      Justice Smith
Affirmed
Opinion delivered and filed January 25, 2023
Do not publish
[CRPM]

